IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| LESHAN HAYDEN | § | |
| *plaintiff* | § | |
| | § | CA No. _____ |
| SYSCO CORPORATION | § | |
| *defendant* | § | JURY TRIAL DEMANDED |
| | § | |
| | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Comes now Plaintiff Leshan Hayden ("Plaintiff" hereinafter or "Hayden") and files this his Original Petition complaining of SYSCO CORPORATION, d/b/a Sysco ("Defendant" hereinafter as "Sysco"), and for cause therefore would show the Court as follows:

### I. PARTIES

1. Plaintiff Leshan Hayden is an individual residing in Harris County, Houston, Texas.

2. Defendant Sysco Corporation is a native for-profit entity, with its corporate headquarters in Houston, Texas. This Defendant may be served with process by service upon its legal counsel, Ms. Dawn Becker, at the Sysco Houston corporate offices at 1390 Enclave Parkway, Houston, Texas 77077.

### II. JURISDICTION & VENUE

3. This Court has Jurisdiction over the claim because the Plaintiff has asserted a claim arising under Federal Law; specifically 42. U.S.C. 1981, and 42 U.S.C. 2000e *et seq*., under 28 U.S.C. Section 1343. Jurisdiction is also proper pursuant to Texas Labor Codes **§**21.051 & **§**21.108 (as amended), as well as Title VII of the Civil Rights Act of 1964 (as amended), and 42 U.S.C. Section 1981. Moreover, Defendant Sysco qualifies as an "employer" under **§**21.002(8)(a).

4.      Venue is proper under this District because the Plaintiff resides in this district and the events giving rise to the events forming the basis for this lawsuit occurred in this District, as well as the Residency of the Corporation in a state with multiple districts, pursuant to 28 U.S.C. §§1391 (b)(2) & (d).

### III.  FACTUAL ALLEGATIONS

5.      Mr. Hayden was hired as a Planner by SYSCO on or about 4/11/2011, and then was promoted to Carrier Development Manager, or "CDM", on or about February 23rd, 2015.  At the time of all incidents relevant, and the time of termination, Mr. Hayden was still employed by Sysco Corp. as a Carrier Development Manager.  This position is below the immediate managing supervisors, and above Mr. Hayden's prior support position of Planner.

6.      One of Mr. Hayden's responsibilities as a CDM is to ensure that otherwise overlooked shipments, or those that cannot fit within a current shipping scheme, are picked up by a third party transportation company, and taken to their intended destination.  In the furtherance of this responsibility, Mr. Hayden's job description allows him a measure of latitude to adjust pricing for these extra, but necessary, un-planned shipments.

7.      SYSCO is then obligated to pay these adjusted contractor rates, as the third party shipping company accepting these last-minute shipments are not usually those already engaged with SYSCO – or if they are engaged, the pricing must be adjusted for the accelerated nature of the delivery / altered nature of their payload.

8.      Mr. Hayden was assigned management of the Western Canada market, and quickly excelled meeting all of his CMP Goals for fiscal-year 2015.  His overall market cost per mile, and cost per case, were all in line with his yearly goals.  After managing the Western Canada market, he was moved to the Southeast US Market and the Southeast RDC market.  Both of these new markets were managed at a high level, and again Mr. Hayden met his CMP goals for fiscal year 2016 and 2017.  He also received merit-based raises all three (3) years based upon his

performance and ability to manage costs for his market(s).  Mr. Hayden has a total of eighteen (18) years of transportation experience, with eleven (11) of those as an owner of a trucking company.

9. It should be noted that the demographic structure of Mr. Hayden's work environment at the time of termination was as follows.  Mr. Hayden is African American.  Of the six (6) Planners beneath Mr. Hayden, only two (2) are African American.  The Managers above him, Mr. Michael Stevens and Mr. Louis Garza, are Caucasian and Hispanic, respectively. Of the nine (9) total Carrier Development Managers (CDM's) employed by this particular SYSCO location, only two (2) of them are African American – including Mr. Hayden.  On information and belief, all other managers and supervisors above the Planner or CDM positions are Caucasian.

10. On or about 5/30/2018, Mr. Hayden received an email from a Planner, Ms. Trisha Chavez, regarding bills of lading and subsequent loadouts for missed shipments – as well as the adjusted rates quoted to a third party shipping contractor, John. J. Jerue, made by Mr. Hayden. This particular email was regarding pricing adjustments made by Mr. Hayden in the course and scope of his duties.

11. No less than 30 minutes after responding to this email, Mr. Keeler, the direct manager over Ms. Chavez, comes to ask Mr. Hayden the same questions again, presumably to receive a verbal response.  Of note, there was no internal SYSCO procedure in place, at the time of incident, dictating that a CDM must answer to a Planner regarding rate adjustments which the CDM is forced to make in order to accommodate these special shipments. Mr. Hayden's actions are noted, and nothing further evolved from the incident.

12. On or about 6/12/2018, after meeting with Mr. Michael Stephens, Director Luis Garza, and a SYSCO Human Resources representative, Mr. Hayden was summarily suspended from work with pay.  At this point in time, SYSCO's management team assured Mr. Hayden that he

would be on a sort of 'extended vacation'. The HR rep informed Mr. Hayden that he would be "suspended with pay, pending an investigation." Neither the HR Rep, Mr. Garza, or Mr. Stephens stated what Mr. Hayden was being investigated for, or why, or how long said investigation would last.

13.     Mr. Hayden was not told any other information, and was immediately escorted from the building. However, upon contacting his co-workers and colleagues from his vehicle immediately after his ejection, Mr. Hayden was told that his manager, Mr. Luis Garza had just informed Mr. Hayden's team [i] of his immediate termination; [ii] that his workload would be disbursed among them; [iii] that they were instructed to not speak with him or contact him; and finally, [iv] that they were advised that he would not be returning to SYSCO. Mr. Hayden first suspect this was going to develop into something further when he realized that SYSCO's management team, and SYSCO Human Resources, had failed to provide him with any paper trail regarding a "suspension with pay", or any type of "paid vacation".

14.     On or about 6/18/2018, Mr. Hayden was summoned back to SYSCO Houston offices for an internal investigation which would turn out to be more akin to an interrogation. Mr. Hayden suspected something was amiss when Security personnel met him while he entered the building and informed him that he was "not even supposed to be on the premises", and that he was "no longer even within the system."[paraphrased] On information and belief, the above meeting was attended by approximately three (3) other individuals, including Raina Avalon, the SYSCO company Auditor, and a member of SYSCO's Compliance Department.

15.     At this 6/18/2018 meeting, the above individuals questioned Mr. Hayden repeatedly on his relationship with a particular shipping company known as John J. Jerue Shipping, which is – on information and belief – owned and operated by Italian Americans. Raina Avalon was particularly wary of this company. Mr. Hayden has noted her on multiple occasions referring to the company was being "involved with the Mafia", or somehow associated with "the mob"

simply due to the Italian heritage of the owner of the company.

16. The particular line of questions utilized in the above 'investigation' made Mr. Hayden feel as though his own employer was accusing him of being 'in bed with the mafia' – or at the very least intentionally or unintentionally colluding or committing fraud for the benefit of the JERUE shipping company, to the direct detriment of SYSCO.

17. However, as of the date of the above meeting, SYSCO was no longer Mr. Hayden's employer, as he was summarily terminated days prior – he simply was not made aware of that fact until approximately two (2) weeks after the above meeting.  This immediate termination was reflected in SYSCO's alteration of Mr. Hayden's automatic email response from his specific in-house intra-net account.  This auto-response was altered multiple times in the time between his "suspension" and his ultimate ejection after this above aberrant interrogation.  Mr. Hayden is of the belief that once SYSCO produces emails sent to his company work email address, this fact will be made clear.

18. Finally, on or about 6/29/2018, Mr. Hayden contacted a SYSCO Human Resources representative by phone.  During this phone call, the representative informed Mr. Hayden that he was not privileged to the findings and conclusions of the internal investigation, and that he had been terminated from employment with Sysco Corp for cause, yet managed to totally avoid stating which policies or procedures Mr. Hayden had breached to warrant immediate termination.  When questioned further about the matter, the representative refused to divulge any other details and terminated the conversation.

19. On information and belief, Mr. Hayden's job description specifically gave him unilateral authority to adjust contract prices for these isolated, individual shipments, without requesting authorization or requiring any oversight of any kind.

20. To Mr. Hayden's knowledge, no contradicting policy existed at the time of his promotion into the position of CDM, and no such contradicting policy existed as of the date of his termination from employment.

21. It is Mr. Hayden's contention that any new changes in policy or procedure regarding this aspect of the CDM position, has only been in effect as of the date of his termination, and is in fact newly developed specifically as a means to terminate him without a shadow of pretext or racial discrimination.

22. More importantly, at no time prior to Mr. Hayden's termination was he given any warning – either written or verbal – regarding his adjustment of contracted shipping prices, as noted in paragraph __ above. This is in regards to any of the following three (3) rate scenarios: (i) Contracted, (ii) Spot Market, or (iii) Capacity Finder. Further, Mr. Hayden never executed any documentation or formal company policy regarding same.

23. Further, the fact that Mr. Hayden is the only CDM to be reprimanded and terminated from SYSCO within a single disciplinary step, as well as the fact that he is one of only two (2) African American CDM's, has fostered a suspicion of racial animus and bias which Mr. Hayden cannot ignore.

24. Mr. Hayden's record with SYSCO Corp. has otherwise been sterling, with leading metrics in his department; no demerits, warnings, demotions, or complaints. Furthermore, it should be reflected that Mr. Hayden was never warned, counseled, or informed of his alleged breach in company procedure or policy; that none of his isolated shipments were behind schedule.

25. Finally, the fact remains that Mr. Hayden was the recipient of at least two (2) awards at his former SYSCO office for superior performance in his position as CDM – executing the same duties and responsibilities for which he was terminated.

26.     As of the date of this lawsuit, Mr. Hayden has been unable to find a similar position at another company which offers commensurate pay and benefits for his particular knowledge base and skill set, despite his best efforts to obtain new employment.  Further, on information and belief, Ms. Rayna Avalon has terminated the JERUE shipping contract with SYSCO Corp. as well.

## IV.   CAUSES OF ACTION

**RACIAL DISCRIMINATION UNDER TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 under 42 U.S.C. §2000e-2 *et seq.*, as well as 42 U.S.C. 1981; *and in the alternative,* §21.002 *et seq* of the TEXAS LABOR CODE the Texas Commission on Human Rights Act of the Texas Labor Code (the "Act")**

### A.    TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, 42 U.S.C. §2000e *et seq.*

27.     Plaintiff hereby adopts all factual allegations above *in haec verba*.

28.     A claim of intentional discrimination may be proved by either direct or circumstantial evidence. See *Wallace v. Methodist Hosp. Sys*. 271 F.3d 212, 219 (5th Cir. 2001).  In cases of circumstantial evidence, courts usually follow the burden shifting analysis articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), for indirect discrimination claims. See *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Wheeler v. BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).

29.     To establish a *prima facie* case of discrimination, a plaintiff must establish he: (1) is a member of a protected class; (2) was qualified for the position at issue; (3) was subjected to an adverse employment action; and (4) was replaced by someone outside the protected class, or other similarly situated persons were treated more favorably.  *McCoy*, 492 F.3d at 556; *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-13 (5th Cir. 2001).

30.     In the instant case, Plaintiff is prepared to show that he (1) is a member of the class (African American) who is intended to be protected by the statute; (2) was qualified for the position at issue, an irrefutable fact as he was vetted and hired by the Defendant; (3) was subject

to adverse employment action, in the form an ultimate adverse employment action, i.e. termination; and (4) other similarly situated persons (all Non-African-American CDMs) were treated more favorably. *Id*.

31.     Plaintiff would further establish his *prima facie* case of discrimination by noting that a multitude of Caucasian and/or Hispanic employees in the same or similar position were not terminated as the Plaintiff had been terminated.

### B.     RACIAL DISCRIMINATION UNDER 42 U.S.C. § 1981

32.     Plaintiff hereby adopts all factual allegations above *in haec verba*.

33.     **§1981 STATUTE OF LIMITATIONS**.  Pursuant to 28 U.S. Code §1658(a); Except as otherwise provided by law, a civil action arising under an Act of Congress enacted after the date of the enactment of this section may not be commenced later than 4 years after the cause of action accrues.

34.     Section 1981 prohibits race discrimination & retaliation, which includes African Americans within that ambit.  For purposes of Section 1981, African American is a "race".  *See Jatoi v. Hurst-Euless Bedford Hosp. Authority*, 807 F.2d 1214, 1218 (5th Cir. 1987); *Banker v. Time Chem., Inc.*, 579 F. Supp. 1183, 1186 (N.D. Ill. 1983).

35.     In the absence of direct evidence of discrimination, Section 1981 cases are governed by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973). *McCoy v. City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Shackelford v. Deloitte & Touche, LLP*, 190 F.3d 398, 403 n.2 (5th Cir. 1999) (noting that Section 1981 claims and Title VII claims use the same burdens of proof and analysis).

36. First, the plaintiff must establish a *prima facie* case of discrimination, "which requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group." *McCoy*, 492 F.3d at 556; *Caldwell v. Univ. of Houston Sys.*, 520 Fed. Appx. 289, 293 (5th Cir. 2013); *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 425 (5th Cir. 2000).

37. If the plaintiff makes a *prima facie* showing of discrimination, the employer must then provide a legitimate, non-discriminatory reason for the employment action. *Byers*, 209 F.3d at 425. "The burden on the employer at this stage is one of production, not persuasion; it can involve no credibility assessment." *Alvarado v. Tex. Rangers*, 492 F.3d 605, 611 (5th Cir. 2007) (quotations and citations omitted).

38. If the employer provides a legitimate, non-discriminatory reason, "the burden shifts back to the plaintiff to establish either: (1) that the employer's proffered reason is not true but is instead a pretext for discrimination; or (2) that the employer's reason, while true, is not the only reason for its conduct, and another 'motivating factor' is the plaintiff's protected characteristic." *Id*. (citation omitted). "Although intermediate evidentiary burdens shift back and forth under this framework, '[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 249 (1981)).

39. The Plaintiff is prepared to show that the reasons given by SYSCO for his immediate termination are not commensurate with any standing written policy espoused by his department or by the Defendant in general, and are in fact pretextual in nature.

## C.  RACIAL DISCRIMINATION under CHAPTER 21 OF THE TEXAS LABOR CODE under the Texas Commission on Human Rights Act §21.002 *et seq* of the Texas Labor Code (the "Act")

40. Plaintiff hereby adopts all factual allegations above *in haec verba*.

41. Plaintiff brings suit against Defendant for damages sustained as a result of their discrimination in wilful violation of the Texas Commission on Human Rights Act §21.000 *et seq* of the Texas Labor Code (the "Act").

42. Under §21.051 of the Texas Commission on Human Rights Act (codified within §21.000 *et seq* of the Texas Labor Code): An employer commits an unlawful employment practice if because of ...*race*, the employer: (1)... discharges an individual, or discriminates in any other manner against an individual in connection with compensation or the terms, conditions, or privileges of employment; or (2) limits, segregates, or classifies an employee ... in a manner that would deprive or tend to deprive an individual of any employment opportunity or adversely affect in any other manner the status of an employee. *Id*.

43. Pursuant *Ysleta ISDA v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005). "To prevail on a claim of racial discrimination, the plaintiffs had to prove that (1) they were members of a class protected by the act, (2) they were qualified for their positions, (3) they were terminated, and (4) they were treated less favorably than similarly situated members of the opposing class. *Id*.

44. In this case, Plaintiff (1) as an African American, belongs to a protected class, (2) was qualified for his position, (3) was terminated from his position, and (4) the plaintiff was treated less favorably than similarly situated Non-African-American employees. *Id.*

45. Under §21.125 of the Texas Commission on Human Rights Act (codified within §21.000 *et seq* of the Texas Labor Code): Except as otherwise provided by this chapter, an unlawful employment practice is established when the complainant demonstrates that race, color, sex, national origin, religion, age, or disability was a mere *motivating factor* for an employment

practice, even if other factors also motivated the practice, unless race, color, sex, national origin, religion, age, or disability is combined with objective job-related factors to attain diversity in the employer's work force. *(Emphasis added) Id*.

46. Plaintiff argues that his racial background was the reason he was subjected to adverse employment actions, including his ultimate termination, and would also contend that race was a motivating factor - in part or in whole - regarding such adverse employment actions, as well as his eventual termination. Plaintiff is prepared to show that any objective job-related factor exists which would foster the requirement of her termination from AT&T is mere pretext, and would argue that no legitimate non-discriminatory reasons exists that would challenge his assertions, or which could rebut or refute his claims at summary judgment.

47. Plaintiff alleges and will prove that Defendants illegally discriminated against him based upon his race under the Texas Commission on Human Rights Act: **§**21.000 *et seq* of the Texas Labor Code.

## V. INFERENCE OF PRETEXT

48. Where, as here, the plaintiff makes out a *prima facie* case of discrimination, the defendant must articulate a legitimate non-discriminatory reason for the adverse employment decision. *See Baker,* 430 F.3d at 754-55. After the employer does so, "any presumption of [discrimination] drops from the case" and the burden shifts back to the employee to establish that the employer's "stated reason is actually a pretext for [discrimination]." *Baker*, 430 F.3d at 755 (quoting *Septimus*, 399 F.3d at 610-11).

49. The factual allegations incorporated above, combined with the following arguments which clearly display the racial biased applied to Mr. Hayden, all serve as an indicator that any legitimate non-discriminatory reason for termination, such as breach of some heretofore unknown and unwritten procedure regarding price adjustment for isolated shipping, is in fact

nothing more than pre-text. SYSCO constructed their recorded interviews of Mr. Hayden in order to allege that he colluded with Jerue to make money off of SYSCO – a factual impossibility, given that no monetary gains can be made to benefit any CDM as that position does not deal with liquid assets or credit receipts, etc. Moreover, the Defendant has supplied an abundance of factually inaccurate and incomplete information to the EEOC in their responding position statement, the measure of which would provide ample resource for pretext in nearly all charges and causes of action alleged by the Plaintiff. By and through this argument, Plaintiff's claims would survive summary judgment.[1]

## VI. DAMAGES

50. A claim of intentional discrimination may be proved by either direct or circumstantial evidence. See *Wallace* v. *Methodist Hosp. Sys*. 271 F.3d 212, 219 (5th Cir. 2001). See also *McCoy*, 492 F.3d at 556; *Okoye* v. *Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 512-513 (5th Cir. 2001). In cases of *circumstantial* evidence, courts usually follow the burden shifting analysis articulated in *McDonnell Douglas Corp*. v *Green*, 411 U.S. 792, 802 (1973)(emphasis added), for indirect discrimination claims. See *McCoy* v. *City of Shreveport*, 492 F.3d 551, 556 (5th Cir. 2007); *Wheeler* v. *BL Dev. Corp.*, 415 F.3d 399, 405 (5th Cir. 2005).

51. Indeed, most federal courts disregard a requirement for direct evidence when indirect or circumstantial evidence is available. See *Desert Palace, Inc*. v. *Costa*, 539 U.S. 90 (2003)(rejecting direct evidence rule); *Sanderson* v. *Reeves Plumbing Co.*, 530 U.S. 133 (2000)(rejecting rule requiring direct evidence).

---

[1] *See, e.g., Haire v. Board of Sup'rs of La. State Univ. Agricultural & Mech. Coll.*, 719 F.3d 356, 365 n. 10 (5th Cir. 2013) (reversing summary judgment for the employer in a discrimination case, and holding that, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence . . . is likely to support an inference of discrimination *even without further evidence of defendant's true motive*.") (italics in original)

52. Given Mr. Hayden's award-winning record of performance and evaluation of his metrics in the course and scope of his work, it is also his contention that any proffered legitimate nondiscriminatory reasons SYSCO would set forth in efforts to legitimize their treatment of him, or the termination proceedings which followed his hidden termination, would fundamentally be pretextual in nature.

53. The damages under Section 1981 and Title VII consist of back-pay, front-pay (or reinstatement), compensatory damages, punitive damages, attorney's fees, and costs. Each component is explained below.

54. **BACK PAY**. Prevailing claimants under the anti-discrimination laws may recover lost back-pay and benefits. *See Miller v. Raytheon Co.*, 716 F.3d 138, 146 (5th Cir. 2013). The purpose of back pay is to "make whole the injured party by placing that individual in the position he or she would have been in but for the discrimination." *Sellers v. Delgado Cmty. Coll.*, 839 F.2d 1132, 1136 (5th Cir. 1988).

55. **FRONT PAY**. "Front pay refers to future lost earnings." *Wal-Mart Stores v. Davis*, 979 S.W.2d 30, 45 (Tex. App.–Austin 1998, pet. denied). Regarding the calculation of front-pay, the Fifth Circuit has stated that "[f]ront pay is . . . calculated from the date of judgment to age 70, or the normal retirement age, and should reflect earnings in mitigation of damages." *Patterson*, 90 F.3d at 936 n. 8 (citing J. Hardin Marion, Legal and Equitable Remedies Under the Age Discrimination in Employment Act, 45 MD.L.REV. 298, 330–334 (1986)). *See also Blum v. Witco Chem. Corp.*, 829 F.2d 367, 374 (3d Cir. 1987) ("In calculating a front pay award, the jury must consider the expected future damages caused by defendant's wrongful conduct from the date of judgment to retirement.").

56.     **COMPENSATORY DAMAGES**.  Mr. Hayden has suffered future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses, for which he seeks recovery in this lawsuit under Section 1981 and Title VII.  *See, e.g.*, *Salinas v. O'Neill*, 286 F.3d 827, 833 (5th Cir. 2002) (affirming $150,000.00 compensatory damages award under Section 1981 where the plaintiff did not receive a position because of his race); 42 U.S.C. § 1981A(a)(1) (providing for compensatory damages for such harms under Title VII).

57.     **PUNITIVE DAMAGES**.  AT&T acted with malice and reckless indifference to Mr. Sander's federally protected civil rights, thus justifying awards of punitive damages under Section 1981 and Title VII.  *See, e.g.*, *Abner v. Kansas City Southern Railroad Co.*, 513 F.3d 154, 164 (5th Cir. 2008) (affirming $125,000.00 punitive damages awards to each plaintiff under Section 1981, even though each plaintiff was awarded only $1.00 in actual damages, and strongly suggesting that any punitive damages award up to $300,000.00 per plaintiff would have been appropriate even in the absence of any actual damages); *Hampton v. Dillard Dept. Stores*, 18 F. Supp. 2d 1256 (D. Kan. 1998) (awarding the plaintiff $1,100,000 in punitive damages in a Section 1981 race discrimination case); 42 U.S.C. § 1981A(a)(1) (providing for punitive damages under Title VII when the discrimination is shown to be with "malice or reckless indifference"). In *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S. Ct. 2118 (1999) the U.S. Supreme Court, interpreting Title VII, held that to satisfy the "malice or reckless indifference" requirement, the plaintiff does not have to prove that the violation was egregious or outrageous. *Id*. at 535-36.

58.     Rather, all that is requires is proof that the employer knew that is was acting in the face of a perceived risk that its actions were in violations of the law's prohibition against discrimination. *Id*.; *see also Schexnayder v. Bonfiglio*, 167 Fed. Appx. 364, 368 (5th Cir. 2006) ("a jury may

award punitive damages pursuant to Title VII merely if the employer knew it *may have been violating the law.*") (italics in original).

59. **ATTORNEY'S FEES**. Attorneys fees are recoverable to a prevailing plaintiff under Section 1981 and Title VII. *See Miller*, 716 F.3d at 149 (affirming an award of attorneys' fees of $488,437.08 to the plaintiff in a single-plaintiff discrimination case that arose in Dallas); *Lewallen v. City of Beaumont,* 394 Fed. Appx. 38, 46 (5th Cir. 2010) (affirming an award of attorneys' fees of $428,421.75 to the plaintiff in a single-plaintiff discrimination failure to promote case); *Watkins v. Input/Output, Inc.*, 531 F. Supp. 2d 777, 789 (S.D. Tex. 2007) (awarding prevailing plaintiff in a single-plaintiff discrimination case tried in Houston $336,010.50 in attorneys' fees).

60. Due to the unlawful discrimination engaged in by Sysco, Mr. Hayden has experienced concrete economic harm in economic damages, as well as emotional distress.

## VII.   EXHAUSTION OF MR. HAYDEN'S TITLE VII CLAIMS

61. Mr. Hayden's claims for race discrimination are based on 42 U.S.C. 1981. Section 1981 claims have no exhaustion requirement, and no damages cap. *See Williams v. E.I. du Pont de Nemours*, 154 F. Supp. 3d 407, 420 (M.D. La. 2015). Mr. Hayden's Section 1981 race discrimination claims are subject to a four-year statute of limitations. *See, e.g., White v. BFI Waste Servs., LLC*, 375 F.3d 288, 292 (4th Cir. 2004) ("[C]laims of discrimination in compensation [under § 1981] arise under the 1991 amendments" and thus, are subject to the four-year statute of limitations.).

62. Mr. Hayden's claims for racial discrimination is based on Title VII. Exhaustion occurs when the plaintiff files a timely charge with the EEOC and receives a statutory notice of right to sue. *See Dao v. Auchan Hypermarket*, 96 F.3d 787, 788-89 (5th Cir. 1996).

63.  Regarding the second requirement, Mr. Hayden received a statutory notice of right to sue from the EEOC that was sent to him on or about September 9th, 2019, and he is timely filing suit after having received the letter. Accordingly, Mr. Hayden has exhausted his administrative remedies under TITLE VII.

## VIII.  JURY DEMAND

64.  Mr. Hayden demands a trial by jury.

## IX. PRAYER

65.  Mr. Hayden asks that he be awarded a judgment against SYSCO for the following:

   a.  Actual damages including but not limited to pecuniary losses, non-pecuniary losses, Back-Pay, Front Pay, Compensatory Damages, and, Punitive Damages; in the sum of $350,000.00; and,

   b.  Prejudgment and post-judgment interest;

   c.  Attorney's fees and court costs; and,

   d.  All other relief to which Plaintiff is entitled.

Respectfully Submitted,

_/s/Julian Frachtman_
H. Julian Frachtman
SDTX No. 2695031
SBN:24087536
tel: 832.499.0611
fax: 713.651.0819
Hfrachtmanlaw@gmail.com
3100 Richmond, Ste 203
Houston, Texas 77098

ATTORNEY FOR PLAINTIFF